UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | File No. 3:22-cr-00069 |
| vs. | ) | |
| | ) | |
| Adolph Akwe Lawrence, | ) | |
| | ) | |
| Defendant. | ) | |

# TRANSCRIPT OF MOTION TO SUPPRESS

Taken at
United States Courthouse
Fargo, North Dakota
December 11, 2025

BEFORE THE HONORABLE ALICE R. SENECHAL
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

Kristen M. Keegan
U.S. District Court Reporter
220 East Rosser Avenue
Bismarck, ND 58501
701-530-2313

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

APPEARANCES

Matthew P. Kopp
United State's Attorney's Office
655 First Avenue North, Suite 250
Fargo, North Dakota 58102-4932

FOR THE UNITED STATES

- - - - - - - - - - -

Ryan Sandberg
Pringle & Herigstad, PC
2525 Elk Drive
Minot, North Dakota 58702-1000

FOR THE DEFENDANT

- - - - - - - - - - -

Certificate of Court Reporter - Page 44

INDEX OF EXAMINATIONS

| WITNESSES FOR PLAINTIFF: | PAGE |
| --- | --- |
| Detective Joshua Heller | |
| Direct Examination By Mr. Kopp | 7 |
| Cross-Examination By Mr. Sandberg | 19 |
| Redirect Examination By Mr. Kopp | 32 |
| Recross-Examination By Mr. Sandberg | 34 |
| Continued Recross-Examination By Mr. Sandberg | 40 |

(The above-entitled matter came before the Court, the Honorable Alice R. Senechal, United States District Court Magistrate Judge, presiding, commencing at 2:00 p.m., Thursday, December 11, 2025, in the United States Courthouse, Fargo, North Dakota. The following proceedings were had and made of record in open court with the defendant and parties present:)

---------------

THE COURT: Today is December 11, 2025. It is 2:00 p.m. This is a hearing in a case captioned United States of America versus Adolph Akwe Lawrence. The case number is 3:22-cr-69.

Matthew Kopp is here representing the United States. Mr. Lawrence is here along with Attorney Ryan Sandberg who is representing him.

We are using a court reporter who is working via video from a Bismarck courtroom this afternoon.

And I will ask the court reporter if, at any point, you need someone to slow down or repeat or have any problems at all hearing us, please let us know right away.

THE COURT REPORTER: I will.

THE COURT: Thank you.

We're here this afternoon to consider a motion to suppress evidence. Mr. Lawrence filed that motion on August 19, 2025, and the motion focuses on use of automatic license plate reader data.

I understand that the United States plans to call one witness?

MR. KOPP: That's correct, Your Honor.

THE COURT: And Mr. Sandberg, do you intend to call witnesses?

MR. SANDBERG: No, Your Honor.

THE COURT: Okay.

Well, Mr. Lawrence, the procedure we're going to follow here today is the same as that we followed with your first motion to suppress. This afternoon is the time to take evidence. I will prepare a Report and Recommendation that will go to Judge Welte and will go to your attorney and to the prosecutor.

Both attorneys will have a chance to object to whatever recommendation I make, and Judge Welte will then make the decision on the motion. So I'm not going to be deciding, I'm going to be recommending.

And if the attorneys ask to have a transcript of this hearing after today's hearing is over, then we'll get some timeline as far as when that might be available, and I will give the attorneys a chance to submit additional briefs if they choose to do that.

So it will be some period of time before there's a decision on this motion. I do hope that my schedule allows me to get it done more quickly than with the last one.

Do you have any questions about the process, Mr. Lawrence?

THE DEFENDANT: No.

THE COURT: Okay. Then, Counsel, is there any desire to make an opening statement?

MR. KOPP: No, Your Honor. But I would just like to briefly frame the issues. There are two motions that were filed: One was a motion to suppress; one was a motion to dismiss based on double jeopardy.

Mr. Sandberg and I had talked before the hearing. We agree there's no need for testimony on the motion to dismiss.

Also, there are two issues raised in the suppression motion: One about ALPR data; and one about the search of the package that was found in the car.

We agree there's no need for additional testimony on the package search as that was established in the previous hearing. We also agree that all the testimony from the previous hearing can be used for the Court's consideration for today.

THE COURT: Thank you.

Mr. Sandberg, is that consistent with your understanding?

MR. SANDBERG: Yes, Your Honor.

THE COURT: I have, of course, reviewed the briefs that were submitted, and I have reviewed the Report and

Recommendation and Order that was filed after the first hearing. So looks like we are ready to proceed.

MR. KOPP: The United States calls Detective Joshua Heller.

THE COURT: Detective Heller, you're feeling better today?

DETECTIVE HELLER: A lot better, Your Honor.

THE COURT: Please take an oath.

Detective Joshua Heller,

called as a witness, being first duly sworn, was examined and testified as follows:

THE COURT: Please proceed.

DIRECT EXAMINATION

BY MR. KOPP:

Q. Good afternoon. Could you please state your name for the record.

A. Joshua Heller.

Q. You testified previously in this matter; is that correct?

A. Correct.

Q. Are you still employed as a detective with the Fargo Police Department and assigned as an FBI Task Force officer?

A. I am.

Q. The reason we're here today is a traffic stop on March 8, 2022, where there were approximately 3,000 fentanyl pills seized from a red Kia; is that correct?

A. Correct.
Q. And that seizure was part of an ongoing drug trafficking investigation that you were involved in at the time?
A. Yes.
Q. On the day of that traffic stop, you first located Adolph Lawrence at an apartment complex in north Fargo?
A. Correct.
Q. Specifically, the address for that apartment was 3102 Third Street North? Does that sound right?
A. Yes.
Q. Could you briefly refresh us on how you identified that address as being linked to your investigation?
A. We identified that address earlier in the week, I believe on March 1st, of -- while I was off duty and I was walking into Scheels All Sport here on 45th Street in Fargo, North Dakota.
As I was walking into that address, I recognized Ennis Lawrence and an unidentified male at the time who we later identified as Adolph Lawrence.
Myself and other special agents and detectives followed the Kia with Adolph and Ennis inside of it to AT&T on 13th Avenue for a brief period and then we followed it to north Fargo at that address on Third Street.
Q. Were you able to see anyone get out of the vehicle once it arrived at that apartment?
A. Yes. Ennis and Adolph both got out of the vehicle.

Q. Did they go inside of --
A. They went in --
Q. -- that apartment complex then?
A. Yep. They went inside of the vehicle -- or inside of the apartment on the -- the east side of the apartment building, on Third Street side. Went inside and we could observe them go downstairs into the apartment, the lower level, the garden-level floor, and take a left.
Q. Did you do some follow-up investigation to confirm Ennis Lawrence and that red Kia's association with the address as well?
A. I did.
Q. And were you able to confirm that association?
A. Yes. I used Axon ALPR data.
Q. And what is ALPR?
A. ALPRs are automated license plate readers.
Q. Okay. And what does ALPR do?
A. ALPRs are affixed to all of our -- or they're part of our squad fleet cameras, our in-dash cameras. They capture license plates on vehicles in public areas or they capture the license plate with a picture of the vehicle and the location stamped in time.
Q. Now, in addition to ALPR data, were there other investigative techniques you used to associate Ennis Lawrence to that address?

A. Yes. We were able to locate a social media account for Ennis Lawrence. Within that social media account, we observed Instagram stories that showed Ennis in a kitchen. We're then able to do a search of that apartment complex on apartments.com to look at both photos which looked the same, the photos from the online website and the photos from Ennis Lawrence's Instagram post.
Q. Going back to ALPR, what do photographs taken by ALPR look like?
A. It just looks like -- it's just a photo of a vehicle parked or driving on a -- a public roadway.
Q. And what areas are ALPR photos taken of?
A. They're taken photos of the vehicle.
Can you rephrase your question?
Q. Yeah. So as a car is driving by and taking these ALPR photographs, is it able to capture areas that wouldn't otherwise be accessible to the public?
A. It would not be accessible to the public. Any -- ALPRs on squad camera -- or on squads are able to capture just data that is pertinent to -- that is publicly -- or on roadways or areas that are publicly available.
Q. So it would go wherever the car would go --
A. Correct. Yep.
Q. -- essentially, right? Could it see things like, for example, a license plate at the end of someone's driveway?

A. It could.
Q. Could it see something in a parking lot that's near a street?
A. It could, yes.
Q. But primarily it can see what's on public roadways and parked on streets, correct?
A. Yes.
Q. What does the Fargo Police Department use ALPR data for generally?
A. We use it for all kind of investigative purposes. Primarily leads or any kind -- like I said, any kind of investigative purpose; could be narcotics related, theft related, burglaries. We've used them in homicide cases. But it's primarily used for an investigative technique to create leads.
Q. At the time this traffic stop happened in March 2022, where did the Fargo Police Department deploy ALPR cameras at?
A. They were just on our squad cameras, our squads, our patrol vehicles.
Q. Approximately how many squad cars are patrolling in the city of Fargo at any given time?
A. It varies but I would say between 13 and 20.
THE COURT: I'm sorry, did you say 13 and 20?
THE WITNESS: 13 and 20.
THE COURT: Thank you.

Q. (MR. KOPP CONTINUING) Since that time, has the city of Fargo also purchased fixed cameras at points throughout the city?
A. Yes. Last year we implemented flock ALPRs throughout the city.
Q. And --
A. I believe we have approximately 21 of them.
Q. What are flock ALPRs?
A. The flock LPR -- ALPRs are just -- essentially it's a camera similar to what would be in our squad vehicles, but they are affixed to intersections, light posts, or traffic light signals.
Q. But at the time this traffic stop happened, those flock cameras had not yet been installed?
A. They had not.
Q. So how limited is this data then when squad cars are collecting it? What are the factors that determine whether someone's vehicle is picked up on an LPR?
A. Sure. There's -- there's quite a few different factors for the squad cars. Obviously squad cars aren't going to be on the roadway 24/7 on every roadway. It could be -- the data that they gather on any particular shift could be a result of calls for service they're going to, that could be anywhere throughout the city, they could be going to the north side or the south side.

So it could be -- there's a lot of variables on what data ALPRs can collect based on where that officer drives throughout their shift.

Q. Does ALPR technology collect constant surveillance data on vehicles in the city of Fargo?

A. No.

Q. How long does the Fargo Police Department retain ALPR data for once it's collected?

A. 90 days in Axon.

Q. And that's for the squad cars; is that correct?

A. The squad cameras, correct.

Q. Is the flock cameras slightly different than that?

A. Yes, they're at 30 days.

Q. Okay. Do you still have access to the ALPR photographs that were taken related to this case?

A. I do not.

Q. Okay. And what happened there?

A. I don't recall. I ran the ALPR through our system of the vehicle, the -- the California plate for the Kia, and we don't have that -- the actual data for that or the screen grab.

I either contacted the agent involved and advised him what the search came up with or I may have emailed him the information, but we do not have it anymore unfortunately.

Q. And would that be a common thing for you to do would be to just call and verbally relay what you --

A. Yeah. In my -- in my current role as the intelligence detective at the Fargo Police Department, I get a lot of calls on our LPR systems and -- to run plates, and it's usually a quick call; hey, can you run this plate to see where it's been in Fargo or if it has been in Fargo.

And I ask whether if it's a special agent or another detective in a jurisdiction to ask for a case number and reason to why I'm searching that.

Q. The data can be preserved for longer if it's flagged for further investigation, correct?

A. Correct.

Q. But in this case that wasn't done as you relayed the information, right?

A. Correct.

Q. Okay. So in this case were you able to identify the license plate number on the red Kia that you followed from Scheels to the apartment in north Fargo?

A. Yes.

Q. Did you run that license plate number through the Fargo Police Department ALPR system?

A. Yes.

Q. What was the result of that search?

A. The search gave us a result of no less than ten reads of the vehicle being parked in front of -- or I believe in the 3100 block of Third Street North on the roadway on the west

side of the road.
Q. Was it no less than ten or no more than ten?
A. No less than ten.
Q. Okay. And all of those photographs showed this vehicle on the public street in front of the apartment complex?
A. Correct.
Q. Did you then follow up and see who that vehicle was registered to?
A. I did, yep.
Q. And what did that result come back as?
A. A female from Sacramento, Michell Gutierrez. I always -- can't quite remember the name but.
Q. When you looked at the ALPR photographs, did they show anyone inside the car?
A. No.
Q. Did they show anyone near the car?
A. No.
Q. Were there photographs of any people visible around those vehicles?
A. No.
Q. Is there a parking lot at that apartment complex?
A. There is.
Q. Did any of those photographs show the vehicle parked in the parking lot?
A. No.

Q. All the photographs were shown of that vehicle parked on a public street in front of the complex, correct?
A. Yes, on Third Street.
Q. Going then to March 8, 2022, you went to 3102 Third Street North to conduct surveillance that day, correct?
A. Correct.
Q. And the reason for that surveillance was in attempt to arrest Ennis Lawrence on an outstanding parole violation?
A. Correct.
Q. Did you look at ALPR data at any time on March 8th to determine whether that red Kia was at the apartment building that day?
A. No.
Q. Did anyone else on the investigative team look at ALPR data that day?
A. No.
Q. Why not?
A. The -- us following the vehicle from Scheels on the 1st, we had a pretty good idea that's where we could locate the vehicle.
Q. So you had physically seen that vehicle at that address before?
A. Yes.
Q. Did you have any other locations in Fargo that you knew the red Kia to be associated with?

A. No.
Q. Did you have any other addresses that you knew Ennis Lawrence to be associated with?
A. One previous address, yes.
Q. And what was that address?
A. Ms. Barclay's address on 16th Avenue.
Q. That ultimately came up in this investigation as well, right?
A. Correct.
Q. But other than --
A. But that -- yeah, that was after -- throughout the investigation.
Q. Okay. Other than those two addresses, would you have had anywhere else to look for Ennis Lawrence that day?
A. No.
Q. In a hypothetical world then where ALPR didn't exist, would you still have gone to that apartment complex on March 8th to conduct surveillance?
A. Yes.
Q. When you actually did conduct the surveillance that day, what did you see?
A. We observed Adolph Lawrence exit the apartment complex, walk to the parking lot where the red Kia was parked, and then left the apartment complex and we followed it to the 16th Avenue address I just mentioned near Cashwise for a short

period of time where we observed Adolph go into the apartment, quickly come out, and then leave again. And then the pathway, the roadways he was taking, appear that he was going back to his apartment; it's the same way he came.
Q. Based on that information, did you believe at that point that the red Kia and whoever was occupying it at that time was involved in the drug trafficking that you were investigating?
A. Yes.
Q. You also mentioned that you saw who you later determined to be Adolph Lawrence get into the red Kia in the parking lot of the apartment complex, right?
A. Correct.
Q. You'd testified that the ALPR system did not capture any photographs of that vehicle in the parking lot?
A. Yes, correct. It did not capture any.
Q. So even if you had looked at the ALPR system that day, it would not have shown the red Kia parked at that address?
A. Correct.
Q. So after you saw the car go to the 16th Avenue address and then start heading back towards the apartment complex in north Fargo, you called an officer with the Fargo Police Department to make a traffic stop on the vehicle, correct?
A. Correct. I -- I initially got on the radio to see if there was any officers available in the area to make a traffic stop for us. Officer Novacek responded and said he could try

to catch up to the vehicle, which he did, and he identified a reason for a stop and conducted a traffic stop on 19th Avenue North.

Q. As that day went on, did you talk to Officer Novacek several times about the traffic stop?

A. Yep.

Q. Did you tell him anything about the ALPR search or the results of that search during those conversations?

A. No.

Q. Did ALPR come up at any point during that traffic stop?

A. No.

Q. Overall, how important was ALPR to your investigation leading up to the traffic stop?

A. It wasn't important.

Q. Could you have done the exact same thing that you did without ALPR?

A. Yes.

MR. KOPP: No further questions.

THE COURT: Thank you.

Mr. Sandberg.

CROSS-EXAMINATION

BY MR. SANDBERG:

Q. So I want to just ask some questions generally about the AL- -- or before we get into the ALPR. You had said that you were off duty and you were at Scheels; is that correct?

A. Yes, sir.
Q. And you ended up recognizing Ennis Lawrence?
A. I did, yeah.
Q. And you saw him get into a red Kia?
A. Correct.
Q. And my understanding is, is you also saw my client get into the red Kia?
A. Correct.
Q. At the time when you saw him at -- at Scheels, did you know or was -- was Adolph Lawrence even involved in the investigation?
A. His name had not came up, no.
Q. You hadn't heard about him at all?
A. No.
Q. So do they look alike, Ennis and Adolph?
A. No.
Q. Okay. And what's the reason why you had Ennis Lawrence on your radar?
MR. KOPP: Your Honor, I'm going to object as this issue has already been litigated. I -- I understand where Mr. Sandberg's going, but we have already had a ruling on how the traffic stop ended up proceeding. We're here today to talk about the ALPR data.
THE COURT: That's true but I do recall some testimony from Detective Heller that is related to the

question, so I will overrule that objection at this time.

THE WITNESS: Could you repeat that?

Q. (MR. SANDBERG CONTINUING) I said what -- how did you get Ennis Lawrence on your radar as a -- involved in drugs?

A. Sure. He came up in a -- a proffer with Malik Chipps.

Q. Came up in a proffer?

A. (Nods head up and down.)

Q. So you had his -- you had a picture of him in the proffer -- during the proffer?

A. Not that I recall.

Q. So how do you know what he looked like?

A. We had a description from Malik Chipps of the -- a shorter 5'5" black male from Sacramento, California driving a red Kia that had longer dreads and somewhat -- wore them up in a -- like up in a bun.

Q. So a --

A. He described him.

Q. So a shorter black -- or black male?

A. Yep.

Q. With dreads?

A. Uh-hum.

Q. About 5'5"?

A. Yes.

Q. And based on that, you said that must be Ennis that -- when you saw him?

A. Yes. Well, we were able to locate additional information through the California DOC on who Ennis was because we had a social media account for him, and we were able to share that picture with California DOC and they helped us identify who Ennis' true identity was off that social media. So I had a picture prior to seeing him at Scheels.

Q. Okay. Because you just testified that you didn't have a picture, but now you -- it's not based off the description of a proffer, now it's you had a picture.

A. Yep, I was confused with your question.

Q. Okay.

A. We had a picture of Ennis.

Q. Okay. And -- so I just want to make sure, now I'm going to get to the AL- -- ALPR technology. So my understanding again these -- this technology is -- is connected to the dash camera of the patrol vehicles?

A. Correct.

Q. Are they in all patrol vehicles?

A. There's a handful that aren't. We have -- we have vehicles -- part of our fleet, we have vehicles that are what we call SRO, school resource officer, vehicles that aren't equipped with all of the technology because they simply just drive to the school and park and they don't necessarily have dash cams --

Q. Okay.

A. -- but the majority of our cameras are, yes, our squad cars are.
Q. And you testified earlier that they don't collect data -- they don't collect data on every vehicle all the time when it's driving, correct?
A. They don't collect data on -- can you rephrase?
Q. So my question is, is I think you had -- you were asked this question about -- strike that.
My understanding is, is every time a police vehicle with one of that technology drives by a vehicle, meets a vehicle --
A. Yep.
Q. -- it takes a picture of that license plate?
A. Correct. Yeah, it takes a picture of -- of the license plate that also captures the greater picture of the vehicle or the picture -- it captures the license plate and the whole -- most of the time it captures the whole picture of the vehicle with the license plate and then it gets a geolocation based, I believe, off of the GPS in the squad car.
Q. Okay. And the officer doesn't have to do anything to activate that, right?
A. Yes, they have to turn on their squad camera.
Q. Okay. So --
A. Well, sorry. They -- they have -- they have to make sure their -- the -- the dash camera is on at the beginning of their

shift.
Q. It's what?
A. They have to make sure their -- their dash camera is on during the beginning of their shift, but otherwise that dash camera's running throughout their whole shift.
Q. So I want to -- I want to make sure I get this right on the dash camera.
A. Yep.
Q. Whenever someone pulls a -- an officer pulls someone over like they did with -- with my client --
A. Yes.
Q. -- when he turned his emergency lights on, it starts recording, correct?
A. Correct.
Q. It maybe goes back 30 seconds from the time that you turn the emergency lights on?
A. Correct.
Q. But when you say "turn on," you mean they actually have to turn it on before they go on their shift?
A. Yes. They have to make sure they set up their computer correctly so all their cameras are working, whether it's the dash camera or the camera behind in the cage.
Q. Okay.
A. And they also test their lights and everything else.
Q. But once they turn that on at the beginning of their

shift, that's when the ALPR system starts taking pictures of every vehicle it passes --
A. Correct. Yep.
Q. -- correct?
A. Yeah. It -- it could -- it will take pictures of the police license plate as it's leaving the station.
Q. So if -- if the officer's vehicle meets a vehicle on -- on -- is there a Broadway here?
A. There is.
Q. Okay. Good. They meet Broadway, takes a picture of it --
A. Correct.
Q. -- takes a picture of the vehicle and the data location and then another car who's right behind it, takes another picture of that one?
A. Correct. Yes.
Q. So it's a constant data collection of license plates and locations of where that license plate was, correct?
A. Yes.
Q. Okay. And I just want to make sure, when you had them do a ALPR on that red Kia, you called somebody and asked about that?
A. I didn't. I got called.
Q. Oh. Did you ask them to -- why would -- how would the Fargo PD know to give you this information on this red Kia?
A. I'm confused by your question.

Q. Well, you -- I said you must have called and asked them to find the location for this -- where this red Kia vehicle was, correct?
A. I received a call from Special Agent Bradt wondering if I could query my system at the Fargo Police Department for that Kia.
Q. Okay. But -- so when you saw this red Kia at Scheels and you followed it, you didn't contact anybody and go, let's see if this vehicle's been any other location?
A. No. In that sense, when we were following it, we had very few officers to follow so I was focused on the vehicle in front of us and I couldn't be on my cell phone making phone calls at that time.
Q. But -- but my understanding is you didn't actually go do the arrest warrant that same day and -- and pull anyone over that day, did you?
A. Myself, no, I did not, no.
Q. So you ended up having time in between there to try to figure out the location of this red Kia with the ALPR, right?
A. I don't think I had much time that whole day. I think I worked 16 hours that day.
Q. But you -- you got -- before you actually went into that location and followed my vehicle -- my client's vehicle -- or the vehicle that he was driving --
A. Uh-hum.

Q. -- you had actually got a -- a location of where that -- that red Kia had been over ten times, correct?
A. Correct.
Q. When did you get that information?
A. It would have been between -- between the 1st and the 8th, the first week of March.
Q. So it was between the time when you saw them at Scheels and when he got pulled over?
A. Correct.
Q. And when you got that information, someone called you from the -- whoever's in charge of the ALPR?
A. No one called me. Well, sorry. Go ahead. Sorry.
Q. I thought you just said someone called you.
A. Yeah, someone called me. Yes.
Q. Okay. So someone called you and said, this is where the location is that -- where this red Kia's been, right?
A. They called me and I said here's the license plate, can you run it through the ALPR system.
Q. And then they ran it?
A. Yes, I ran it.
Q. They ran it for you or do you have -- you run it?
A. I run it.
Q. Okay. So --
A. I have access -- so Special Agent Bradt for the ATF does not have access to our data at the Fargo Police Department, so

I am the point of contact because I am an intelligence and analysis detective so I become the point of contact for a lot of outside agency requests regarding ALPR data or other record management systems and things like that.
Q. Okay. Now this makes -- this is making more sense for me. I thought it was -- I thought you had put a call in to someone at the Fargo PD that's in charge of the ALPR.
A. No.
Q. That's not right?
A. And I can clarify that. Anybody at the Fargo Police Department that's a sworn member can run a license plate reader --
Q. Okay.
A. -- or run a plate through the license plate system. It does not have to be me.
Q. And so when it takes a picture --
A. Uh-hum.
Q. -- or when you got that -- you run that report, do you get an actual report, a physical report?
A. How can I best describe it? You -- you can generate like a PDF of it, but it also -- it's similar to any other search you would see. So you would search the plate and it would give you a list of where the reads are and how many, what date and time.
Q. Does it actually have like a -- a location on a map too

then?
A. It does, yep.
Q. Okay. So you -- you got that too?
A. Uh-hum.
Q. And you didn't keep a copy of that though?
A. I did not.
Q. Okay. Can you do that?
A. You can.
Q. You could have printed it off?
A. You could print it off, you could screen capture it.
Q. Okay. Why didn't you?
A. I don't know.
Q. Okay. And then you -- I think the testimony was that the database for that ALPR information is retained for 90 days?
A. Correct.
Q. On patrol cars?
A. Yep. On the patrol cars, yep.
Q. Okay. And unless you can -- unless you want it preserved further?
A. Correct.
Q. Okay. And you could have done that?
A. I could have.
Q. And you didn't?
A. Correct.
Q. And you had testified that you can actually -- this

system, is -- is it kind of like a radar that gets pushed from the -- is it just like a radar that gets pushed out and then takes a screenshot and then sends it back? Like how -- how does it collect it when it takes a picture of the camera -- or of the -- of the license plate?
A. I guess from my knowledge of it, it just takes a picture. There's no radar or anything. It's just a camera that takes a picture.
Q. But it can actually go onto someone's property -- if it says not -- no trespassing, if the vehicle's facing towards the road --
A. Yep.
Q. -- the cop car could turn and face right towards it, it would actually collect the data? It could -- it could get the information on that license plate, right?
A. Yeah, it would be the -- the -- the view range of the lens. I'm not -- I don't know the specifications of the view range of that lens or all the -- but it could.
Q. But -- it could. Because I think you testified that you could actually collect this data when they're parked in their -- in their house, right, on their -- in their yard?
A. Correct. Yeah, it would be no different to me driving by and writing the plate down or taking a picture myself.
Q. Okay. When it comes to the information you got about a red Kia, did you even have -- you didn't have a license plate

on -- of that red Kia at the time at Scheels?
A. We had a -- a state not the actual number.
Q. Just a California plate?
A. Yes.
Q. For a red Kia?
A. Yes.
Q. And the person that you got the proffer, was -- they specifically said a "red Kia"?
A. Yes.
Q. Okay. Did they say what kind of year it was?
A. I don't recall if they mentioned that.
Q. And I just want to make sure I get this right. When you guys collect this data from the ALPR, you guys don't get a search warrant, correct?
A. No.
Q. It's just a random collection of data?
A. Yeah. Per like -- we have to have a reason to search it.
Q. Okay.
A. So there's like a -- there's a field so that you can put a case number and the reason to why you're searching it.
Q. Is there a -- a burden of proof that you have to have before you can search it?
A. No.
Q. You just randomly select it?
A. You could.

Q. If you knew my license plate, you could do -- check it right now and see if I've been anywhere in -- in --
A. If there's no criminal nexus, it would be against my policy at the Fargo Police Department.
MR. SANDBERG: Can I have a minute with my client, Your Honor?
THE COURT: Certainly.
MR. SANDBERG: I don't have any more questions, Your Honor.
THE COURT: I have one question.
THE WITNESS: Yes, Your Honor.
THE COURT: I think I understood you to say that you received data on the license plate from the red Kia sometime between March 1st and March 8th? Or was that data that had been collected between March 1st and March 8th?
THE WITNESS: The search for the data was between March 8th -- March 1st and March 8th -- sorry. Between March 1st and March 8th is when I ran a query for that data. I believe the data came back to -- of being parked there in February.
The data for the return on the search showed the vehicle was parked in front -- on Third Street in February.
THE COURT: Thank you.
Mr. Kopp.

REDIRECT EXAMINATION

BY MR. KOPP:
Q. Detective Heller, you were asked some questions about the ability of LPR to capture photographs of vehicles on private property. Do you remember that?
A. Yes.
Q. Any officer standing on the street that could see into someone's property could do the same thing, right?
A. Correct.
Q. Any member of the public standing on the street or driving in a vehicle could do the same thing, right?
A. Yes.
Q. There's nothing that would prevent someone from seeing someone's license plate and writing it down because it's facing out to the street?
A. Correct.
Q. The important thing, though, is that LPR does not have access to nonpublic areas like inside of someone's garage for example?
A. Absolutely.
Q. It can't see through walls, right?
A. (Shakes head from side to side.)
Q. And here there were no LPR hits that were returned even from the apartment parking lot, right?
A. Correct.
Q. And you, as an officer, or as a member of the public,

could drive through that apartment parking lot?
A. Yes.
Q. You followed Adolph Lawrence and Ennis Lawrence from Scheels to an apartment complex in north Fargo, correct?
A. Yes.
Q. What's the approximate distance between Scheels and that apartment complex, not in miles but in number of minutes driving perhaps?
A. I would say, you know, 15, 20 minutes.
Q. And it's a fairly lengthy drive through the city of Fargo?
A. Yes. Some busy roads there.
Q. Were there any ALPR hits on that red Kia from the time that it was driving from Scheels to that apartment complex?
A. No.
MR. KOPP: No further questions.
THE COURT: Mr. Sandberg, anything else?

RECROSS-EXAMINATION

BY MR. SANDBERG:
Q. In order for you to -- to get a hit on a -- on a vehicle, you have -- a cop car has to be near it, correct? It has to -- to meet it, right?
A. What do you define as "a hit"? A read or a hit?
Q. A read. A read.
A. Those are two different things.
Q. A read.

A. A read?
Q. Yeah.
A. Yeah, it would -- I mean, picture -- I'm trying to -- I'll try to best describe it, but the -- the camera's centered above the -- your rear view mirror, so it projects as a cone shape, right, going out to the roadway. So, yes, it would have to be near it.
Some LPRs -- ALPRs will catch certain lanes of traffic, some they catch only two, three, or one. I don't know what our specifications are on ours. But that's a little bit of some insight on how it would work too.
Q. You had said there's a difference between a hit and a read. What is the difference?
A. Sure. If -- if there's an Amber Alert that goes out to the public and we have a vehicle alerted to that, and it's entered into NCIC, a national database, our LPRs will notify that officer that there's a missing kid in that vehicle potentially.
Q. Okay.
A. That would go for any NCIC alerts; warrants on sex offenders and such.
Q. So Ennis had a -- a warrant that -- were you aware of at the time then, right?
A. I was but his vehicle did not hit for that because that vehicle was not registered to him. It would have to be a

vehicle registered or somebody -- an investigator would have to have a reason to put that vehicle in NCIC.

Q. You had also testified about -- that you saw -- you looked at Ennis' social media account?

A. Sure.

Q. And you saw -- you compared the background apartment matched the -- kind of like the background of that apartment that you followed him to; is that right?

A. Yeah. So the -- we opened -- we used an open-source investigation tool. We went to apartments.com and seen if that apartment was ever put up for rent. And in many of those photos, there was pictures that showed the potential resident or client of what the apartment looks like, and so we were able to look at those photos and then compare the photos of this -- the Instagram post and it was very similar to where the cabinets were, where the kitchen sink, where the stove were. So we believed it was there.

Q. Did you check any other apartments to see if they also matched the description of the background?

MR. KOPP: I'm going to object as outside the scope of redirect.

THE COURT: Mr. Sandberg, how is that related?

MR. SANDBERG: I -- I just wanted to ask that question. I didn't ask it on the first time. I should have. That's my apology, Your Honor.

THE COURT: Well, I don't see the relevance, but go ahead and answer if you can.

THE WITNESS: So you asked if we checked any other apartments would --

MR. SANDBERG: Yeah.

THE WITNESS: Any apartment --

Q. (MR. SANDBERG CONTINUING) To see if the background of -- that was on his -- on his social media could have been in a different location?

A. We -- the reason we checked that specific apartment is because we followed him there. We had no reason to check other apartments at that time.

Q. Okay. My understanding he did come from another location, though, right? I thought he came from a, is it, 16th Street? Am I wrong on that or was another location that you guys had followed him or it was going back and forth? Am I wrong on that?

A. We followed Adolph from the Third Street North address to the 16th Avenue address for a very short period of time and then back up north to Third Street on March 8th.

Q. But at that point you had -- you had -- you had already looked at his social media account, Ennis'?

A. I don't recall exactly what the date were. I would have to refer to the report --

Q. Okay.

A. -- that Nick Bradt wrote.
Q. Do -- drivers don't -- none of these drivers -- whenever you guys use the ALPR, you don't get consent from the drivers, correct?
A. Consent to do what?
Q. To have their license plate read and their location tracked?
A. No, I don't ask them.
Q. You don't have to, right?
A. No, the PD does not ask them for their consent.
Q. Okay. And that would be -- especially in this case, you wouldn't contact Ennis and say, hey, look, we want to do an ALPR on your vehicle? You wouldn't do that, would you?
A. That would blow up our investigation.
Q. Okay. So it's just nonconsensual location data is collected without their consent?
A. On publically available spaces.
Q. Okay.
MR. SANDBERG: I don't have any more questions.
THE COURT: I want to make sure I understand. When you talk about "a read," are you talking about the dash cam taking the photo?
THE WITNESS: Yeah, so we -- our terminology, "a read" is just all the reads -- or all the pictures of -- the dash cam has taken of each car it passes.

"A hit" would be -- would be compared to like a NCIC warrant which then gets entered into the maybe subject's vehicle and so then we'd have that license place associated to that wanted individual. And sometimes officers will get hits for warrants, missing kids, missing people, things like that. A read is just --

THE COURT: So --

THE WITNESS: -- each time a -- each time the squad car takes a picture of a photo, that's a read -- or of a vehicle, that's a read.

THE COURT: The Axon system takes the reads and gathers them somehow by license plate number?

THE WITNESS: Yeah. So it takes -- the -- the Axon system -- so it will take all of our squad cars -- I'm not exactly sure how it works now -- but they would have to come back to the station where we have our Axon, like, hub, so to speak, and they would all get uploaded into the cloud to a web-based server.

And then through that, we have access to all of our squad car fleet -- fleet cameras, we call them, with the Axon LPR cameras, and then we can search or query any plate we want or need to for an investigative purpose to determine whether, you know, it could be a lead, a wanted person we're looking for, it could be part of an investigation.

THE COURT: So there is some time delay between a

dash cam photo of a license plate and that information from the photo going into the Axon system?

THE WITNESS: That's how I understand it, yes.

THE COURT: Okay.

THE WITNESS: Technology is changing every day, so it could -- with the, you know, different 5G networks and stuff like that, it could potentially do the -- immediately, but as of now I don't think it does.

THE COURT: Thank you.

Has that prompted a desire to ask any additional questions, Mr. Kopp?

MR. KOPP: No, Your Honor. Thank you.

THE COURT: Mr. Sandberg?

MR. SANDBERG: Real quick.

CONTINUED RECROSS-EXAMINATION

BY MR. SANDBERG:

Q. So on a hit, if a cop is driving by and he see -- and it hits, would it show up on his right away and say, hey, this -- there's a -- there's a missing person in this vehicle?

A. Yeah. So it's -- I don't -- I don't know all the specifics how it's pulling but the best I can do is explain how I understand it to pull. I'm not a subject-matter expert in how the Axon system works, but it is -- so when it's a hit for a missing person or a missing kid, it is pulling from NCIC which is a different database. If that makes sense.

Q. No, but I want to know does it show up on the officer's --
A. Screen.
Q. -- screen and says --
A. Yeah, on their MDC, if they have their -- I forgot what it's called -- but their Axon up, their -- their program up, if it's their front-facing screen, or the -- yeah, it will show -- it will say, alert NCIC hit for a missing person and if they have their volume up, it will make an audible sound too.
Q. So it's immediately on a hit to the officer?
A. Yes.
Q. Okay.

MR. SANDBERG: I don't have any more questions.

THE COURT: Thank you, sir.

THE WITNESS: Thank you.

THE COURT: And Mr. Kopp, you do not intend to call additional witness; is that correct?

MR. KOPP: That's correct.

THE COURT: Mr. Sandberg, you do not intend to call any witnesses; is that correct?

MR. SANDBERG: Correct, Your Honor.

THE COURT: All right. Is there any other evidence that we should be talking about this afternoon?

MR. KOPP: I don't believe so.

MR. SANDBERG: No, Your Honor.

THE COURT: And what is counsel's position on

requesting a transcript of today's hearing?

MR. SANDBERG: I would like to get one, Your Honor.

THE COURT: Then I'll ask the court reporter if you could estimate when a transcript of the hearing might be filed.

THE COURT REPORTER: I could file it at the end of next week, so seven days.

THE COURT: Thank you.

Counsel, is there a desire to submit additional briefing?

MR. SANDBERG: I guess I'd like to think about it. But can I just say yes, and then if I don't file one -- I'll let him know if I'm not going to file it, then he doesn't have to go through it or not but.

THE COURT: Give me just a minute.

So the end of next week would be Friday, December 19. How about if we say that any briefing would be filed by December 31st by either side and it be simultaneous briefing? Is that acceptable, Mr. Kopp?

MR. KOPP: Yes, Your Honor.

MR. SANDBERG: Yes, Your Honor.

THE COURT: And that is, of course, dependent on the court reporter's ability to get the transcript filed by December 19th. Things may happen that come on to her schedule that makes that more difficult. So that is a target date, it's not a firmly set date.

Anything else this afternoon, Mr. Kopp?

MR. KOPP: No, Your Honor. Thank you.

THE COURT: Mr. Sandberg?

MR. SANDBERG: No, Your Honor. And this will just be -- if we do brief it, it'd be on the motion to suppress. The other motion to dismiss, the -- on the double jeopardy, you'll just issue a decision on that? Kind of like the last one we did, I think?

THE COURT: The R and R will be just on the motion to suppress.

MR. SANDBERG: Okay.

THE COURT: And I should ask the court reporter, do you have questions about anything? Any clarification that you're after?

THE COURT REPORTER: (Shakes head back and forth.)

THE COURT: Okay.

Mr. Lawrence, again, do you understand the process that's going to be followed from today?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions?

THE DEFENDANT: No.

THE COURT: All right. Thank you, all. We're adjourned.

(Proceedings concluded at 2:49 p.m., the same day.)

CERTIFICATE OF COURT REPORTER

I, Kristen M. Keegan, a district court reporter, DO HEREBY CERTIFY that I recorded in shorthand the foregoing proceedings had and made of record at the time and place hereinbefore indicated.

I DO HEREBY FURTHER CERTIFY that the foregoing typewritten pages contain an accurate transcript of my shorthand notes then and there taken.

Dated at Bismarck, North Dakota, this 18th day of December, 2025.

/s/ *Kristen M. Keegan*
______________________________
KRISTEN M. KEEGAN
United States District Court Reporter
District of North Dakota
Western Division