**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) | Case No. 3:22-cr-69 |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| Adolph Akwe Lawrence, | ) | |
| Defendant. | ) | |

Adolph Akwe Lawrence is charged with involvement in controlled substance and money laundering conspiracies, possession of a controlled substance with intent to distribute, criminal contempt of court, obstruction of justice, and witness tampering. (Doc. 298). In a second motion to suppress, Lawrence contends warrantless acquisition and use of evidence obtained from Automated License Plate Readers (ALPRs) led to a vehicle search that violated his rights under the Fourth Amendment of the United States Constitution. (Doc. 381). He argues collection and retention of ALPR data violated his reasonable expectation of privacy and constituted an impermissible dragnet surveillance program. Further, he asserts the collective knowledge doctrine cannot cure the constitutional violations. (Doc. 382).

The evidence Lawrence seeks to suppress is a large quantity of fentanyl pills found in a package in the vehicle Lawrence was driving when he was stopped for a driving offense. The United States argues Lawrence lacks standing to challenge the package search, use of ALPR data is not a search within meaning of the Fourth Amendment, and regardless of the constitutionality of use of ALPR data, search of the package did not offend the Fourth Amendment. (Doc. 390).

The court held an evidentiary hearing on Lawrence's second motion to suppress on December 11, 2025, at which Fargo, North Dakota, Police Department Detective Joshua Heller was the sole witness. No additional exhibits were submitted during the December 11 hearing. At the conclusion of the hearing, the court gave the parties an opportunity to submit post-hearing briefs after a hearing transcript was filed, but the parties later advised the court they agreed submission of post-hearing briefs was not necessary.

## Evidence Presented at First Hearing

Following an evidentiary hearing on Lawrence's first motion to suppress, this court filed a Report and Recommendation summarizing the hearing testimony and record evidence:

> **1. Investigation Preceding the Traffic Stop**
>
> At the time relevant to this motion, Detective Joshua Heller was assigned to the United States Marshals Service High Plains Fugitive Task Force. In that capacity, in December 2021, he arrested Malik Chipps on a probation violation warrant and found Chipps in possession of a quantity of fentanyl pills and two firearms. When interviewed by law enforcement, Chipps stated he had obtained the pills and the firearms from Bayo Adrian Saibu (Bayo)—a codefendant in this case—and identified Bayo's source as "a shorter black male with dreadlocks [who] had recently been released from a California prison." (Tr. 21).[1] Chipps also told Detective Heller the unidentified black male was known to drive a red Kia with California license plates. Using that information, Detective Heller identified the black male as Ennis Fitzgerald Lawrence (Ennis), a brother of defendant Adolph Lawrence.
>
> Chipps told law enforcement his communications with his source of supply had been through a female who lived at 3301 16th Avenue South in Fargo, and law enforcement identified that female as Ethmonia Korlu Barclay—also a codefendant in this case. Chipps stated he had obtained the pills at Barclay's address and described her address as "kind of a gathering spot" for Ennis and Bayo. Law enforcement corroborated the information Chipps provided through review of text messages. Id. at 24.

[1] Tr. refers to the hearing transcript filed at Docket 364.

Detective Heller testified law enforcement monitored Ennis' social media accounts after receiving the information from Chipps. Ennis' Instagram account showed a video of Ennis—in what appeared to be an apartment kitchen—holding a large amount of United States currency and showed him with "a teeth insert, almost like a mouth guard but with diamonds." Id. at 26. On the video, Ennis stated the cash was "a whole hundred," which Detective Heller testified he knew to be a reference to a hundred thousand dollars. Id. at 25.

Detective Heller, while off duty on March 1, 2022, saw Ennis and a second unidentified "black male with dreadlocks or cornrows" at Scheels All Sports, a Fargo store. Id. at 26. Detective Heller asked Scheels personnel to monitor Ennis and his companion via surveillance cameras and to advise Detective Heller when the two were about to leave the store. While Detective Heller waited in the Scheels parking lot, Scheels personnel provided Detective Heller with several screen shots of Ennis and his companion. When Ennis and his companion left the store, Detective Heller saw them enter a red Kia with California license plates. Law enforcement officers followed the red Kia to 3102 3rd Street North, a Fargo apartment building.

Through a Google search, law enforcement found photos of apartment units in that building and observed the apartment units appeared to be the same as the one in the Instagram video of Ennis holding a large amount of cash. [Fargo Police Department (FPD)] license plate readers confirmed the red Kia had been in the area of 3102 3rd Street North frequently during February 2022.

On March 8, [2022], Detective Heller and other law enforcement officers surveilled the 3102 3rd Street North area in an attempt to locate Ennis regarding a California parole violation warrant. They saw the red Kia in the building's parking lot and observed the unidentified black male who had been with Ennis at Scheels enter the red Kia and drive the vehicle to Barclay's 16th Avenue South residence. The black male entered Barclay's apartment building and left a short time later, behavior Detective Heller considered to be consistent with narcotics trafficking. Law enforcement officers followed the red Kia, and Detective Heller radioed to the FPD patrol unit, asking any patrol officer who saw the red Kia to attempt a traffic stop if there was reason to do so. Detective Heller testified the purpose of the requested traffic stop was to identify the driver of the red Kia.

### 2. March 8 Traffic Stop and Vehicle Search

[FPD] Officer [Jonathan] Novacek testified Detective Heller relayed "very, very loose information" about potential drug activity when he asked officers in the area to stop the red Kia if there was reason to do so. Id. at 62. Officer Novacek responded to the radio request, advised he had followed

and located the red Kia, ran the license plate number, and learned the vehicle's California license tags had expired several days earlier. Officer Novacek stopped the vehicle on 19th Avenue North in Fargo, and Detective Heller parked in a nearby lot to watch the traffic stop. Officer Novacek's body camera, the forward-facing camera on his squad car, and the camera facing the "cage" in the interior of his squad car were all active during the traffic stop, though audio was turned off on the body camera for a period of time during the search. (See Video 1, 34:22-37:51).

During the traffic stop, Detective Heller and Officer Novacek communicated via three phone calls and a text message. Initially, Detective Heller advised Officer Novacek of an investigation into fentanyl trafficking without identifying targets of the investigation. (Tr. 33, 62). Officer Novacek testified the second and third calls were "updates on the traffic stop in general" and the text message was a screen shot he sent to Detective Heller showing results of a query of the red Kia driver's identification information. Id. at 73.

Officer Novacek approached the red Kia twice before deciding to search the vehicle for marijuana. He testified he did not smell marijuana when he approached the vehicle the first two times. Lawrence challenges the credibility of that testimony. The United States asserts Officer Novacek's ability to detect the odor of marijuana was affected by the March 8 weather. Officer Novacek testified,

> It was very, very cold. I'm not sure exactly what the temperature was outside, below freezing, maybe in the high 20s, which doesn't sound so bad; however, the wind was a huge factor that day, blowing somewhat– somewhere in the nature of 25 to 30 miles an hour, making it very, very difficult to be outside.

Id. at 65-66. He also testified the area where he conducted the traffic stop was known to be "particularly windy" and the wind was coming from the northwest, with the front of the squad car facing due east and the rear of the squad car facing due west. Id. at 66, 105-06. He described factors that might have impacted his ability to smell marijuana during his first two approaches to the red Kia:

> Your environment is a – is a huge part of that, so with the wind being what it was, positioning of the vehicle, the passenger side approach with the driver's side window being closed, no air passing through the vehicle at that time, all of those things are a factor. Absolutely. The cold weather in and of itself personally affects me. It's harder to smell those things when it's hard to breathe through your nose.

Id. at 68.

The first time he approached the vehicle, which he testified was for "[n]o more than 15 seconds," Officer Novacek went to the passenger side, spoke to the driver through the open front passenger window, explained the reason for the traffic stop, and asked the driver—the sole occupant—for his license, registration, and insurance information. Id. Officer Novacek invited the driver to step out of the vehicle to view the expired license plate registration and because the driver did not have his license with him, Officer Novacek brought the driver to his squad car, did a pat-down to check for weapons, and placed the driver in the back seat of the squad car.

The driver identified himself as Adolph Akwe Lawrence and stated his cousin, Saibu, owned the vehicle. Officer Novacek queried the vehicle's license plate through a system that holds each state's vehicle licensing records and learned California records showed the vehicle was not registered to Saibu but was registered to Michell Robles-Guiterrez. (Video 2, 03:22-03:30). Lawrence told Officer Novacek he was staying with one of his aunts and gave both the 3301 16th Avenue South and 3102 3rd Street North addresses. (Video 3, 11:29-11:45). Although Officer Novacek initially received information showing Lawrence's driver's license was suspended, he received more accurate information from dispatch later during the stop that showed Lawrence's license was current. (Video 2, 08:40-10:33). Officer Novacek queried Lawrence's name, found a photo of Lawrence, and sent a screenshot of the photo to Detective Heller. At that point, Officer Novacek warned Lawrence about the need to carry his driver's license and to get the vehicle registration figured out but did not issue a citation. (Tr. 76; Video 2, 12:12-13:16).

Officer Novacek testified when he first approached the vehicle, he stood "slightly behind [the passenger side pillar] and above, just enough where [he could] see inside the vehicle." (Tr. 98). He testified he did not smell marijuana when he was in that position, or when he stood "maybe a foot" from Lawrence while putting him in the squad car, or when he did the pat-down of Lawrence, or while Lawrence was in the back seat of the squad car while Officer Novacek checked Lawrence's license and registration information. Id. at 106-07; (see also Video 1, 00:05-00:18; Video 2, 01:06-01:21).

Since he had not received information confirming vehicle insurance coverage, Officer Novacek walked back to the red Kia with Lawrence, and Lawrence opened the front passenger door and handed Officer Novacek three or four pieces of paper as insurance information. Officer Novacek testified it was unusual to receive insurance information other than as a single piece of paper or a small index card. Id. at 77. During his second approach to the red Kia, Officer Novacek stood "right next to the rear right side passenger door" while Lawrence retrieved the documents. Id. at 100.

Again, Officer Novacek did not smell marijuana. (See Video 1, 12:25-13:20; Video 2, 13:35-14:20).

Because wind speed made it difficult to read them, Officer Novacek took the papers Lawrence had given him to the squad car, and Lawrence returned to the red Kia. While he was in the squad car, Officer Novacek ran a query for Korlu Barclay—the name on a package in the front seat of the red Kia—but the query yielded no results. Officer Novacek testified he could not locate insurance coverage dates on the documents Lawrence had given him, he approached the vehicle for the third time, and he immediately smelled an odor of marijuana as he reached into the vehicle to return the insurance documents to Lawrence. (Tr. 79). Officer Novacek testified reaching into the vehicle to hand the papers back to Lawrence provided a break from the wind and he could then smell the odor of marijuana. (See Video 1, 17:32-18:30; Video 2, 18:31-19:33). On cross-examination regarding his distance from the red Kia during that third approach, Officer Novacek testified he was further forward than he had been on the first approach and his body camera's lens had a "tendency to be kind of a fish-eye lens, which can distort distances." (Tr. 120); (see also Video 1, 17:32-18:30; Video 2, 18:31-19:33).

After he smelled the marijuana odor, Officer Novacek decided there was probable cause to search the red Kia for marijuana. Officer Novacek then brought Lawrence back to the squad car, took a cell phone from Lawrence, and again placed Lawrence in the back seat of the squad car. (Video 1, 18:40-19:20; Video 2, 19:45-20:20). Officer Novacek testified he smelled the odor of marijuana when he placed Lawrence in the back seat of the squad car and Lawrence told him he had no marijuana on him. (See Video 1, 18:50-19:05). Officer Novacek told Lawrence he had probable cause to search the whole vehicle, including the package in the front seat of the vehicle. (Tr. 134; Video 1, 21:37-21:49; Video 2, 22:40-22:50). Lawrence then "alluded to somebody smoking marijuana recently within the vehicle." (Tr. 80). Officer Novacek asked for backup to conduct the search, and [Fargo Police Department] Officer [Joshua] Marvig arrived on the scene and assisted with the search. (Video 1, 18:40-19:24).

Officer Novacek located "shake"—small particles of suspected marijuana—on the floorboard of the red Kia and also observed a cylindrical ashtray containing cigarillos. Officer Novacek testified it was common to remove tobacco from cigarillos and use their flavored wrapping to smoke marijuana. (Tr. 115). Neither the shake nor the cigarillos were seized as evidence.

Officer Marvig arrived at the scene four to five minutes after Officer Novacek began the vehicle search. (Video 2, 27:05). Officer Marvig described how he assisted in the search of the red Kia, beginning at the driver's door. He testified he "noticed and articulated a strong odor of

marijuana" immediately after opening the door, noticed shake on the driver's side floorboard, and saw a portable vacuum and a waste bin filled with loose-leaf tobacco. He considered the loose-leaf tobacco significant because of his knowledge that marijuana users sometimes cut open cigars and use the rolling paper to smoke marijuana. (Tr. 126-27).[2]

Officer Novacek testified he is trained to recognize the odor of marijuana, odors of burnt and raw marijuana are very similar, and the odor he detected could have been from the shake on the floorboards. Officer Marvig also testified he was trained to recognize marijuana odor.

Between his second and third approaches to the red Kia, Officer Novacek had relayed the name Korlu Barclay—which was on the package on the front seat of the vehicle—to Detective Heller, and Detective Heller recognized it as Ethmonia Barclay's middle name, used as her first name. Detective Heller knew Barclay's nickname was "Auntie," and Lawrence had told Officer Novacek he was staying with his aunt. Id. at 35-37, 72. As part of the vehicle search, Officer Novacek opened the package and found it contained an inexpensive DVD player. The package had been overnighted from Sacramento, California, to Fargo, and Officer Novacek found it odd the package was sent overnight since it contained only the inexpensive DVD player. Detective Heller testified sending packages via overnight mail was significant because overnight mail is frequently used for narcotics trafficking. Id. at 36. When he took the DVD player out of its packaging, Officer Novacek saw something wrapped in foil was inside what would have been the DVD port.

After he saw something wrapped in foil in the DVD port, Officer Novacek took the package back to the squad car, again asked Lawrence about the name on the package, disassembled the DVD player, and located individual packages of what he believed to be fentanyl pills, wrapped in foil, inside the device. (Video 2, 28:50). The Second Superseding Indictment charges Lawrence "possessed approximately 3,000 pills containing a mixture and substance containing fentanyl with the intent to distribute" in Fargo on March 8. (Doc. 297, p. 3).

Officer Novacek then decided to arrest Lawrence and placed him in handcuffs. (Tr. 83). While placing the handcuffs, Officer Novacek asked Lawrence if he had been around anyone who had recently smoked marijuana, and Lawrence confirmed he had been. Officer Novacek testified Lawrence at no time denied the red Kia smelled like marijuana. While Lawrence was in the back seat of the squad car, Officer Novacek took a second cell phone from Lawrence and testified a person having two cell

---

[2] The dash camera video shows three other uniformed personnel arrived after Office Marvig, but the record includes no evidence about any involvement they may have had in the traffic stop or in searches of the vehicle or package. (See Video 2, 36:27).

phones was consistent with drug trafficking activity.[3] Officer Novacek testified he read Miranda rights to Lawrence when detaining him. After completing the search of the package, Officer Novacek told Lawrence he was being arrested for possession with intent to deliver and put him in handcuffs. Officer Novacek asked Lawrence if he wanted to work with him or tell him anything, and Lawrence gave no response. (Video 2, 39:57-42:18; Video 3, 39:19-42:15). Lawrence declined Officer Novack's request that he provide a password for a cell phone. Officer Novacek transported Lawrence to the Cass County Jail in Fargo. After the squad car was parked outside the jail, Officer Novacek again asked Lawrence if he wanted to tell him anything, and Lawrence again declined to respond. (Video 2, 01:07:20-01:08:33).

### 3. Ownership of the Red Kia

When cross-examined, Detective Heller testified that, at the time of the March 8 traffic stop, he knew Saibu owned the red Kia, though on redirect-examination, he testified he had not known the name of the registered owner until Officer Novacek told him a name. (Tr. 40, 46).

Officer Novacek testified when he asked Lawrence to step out of the vehicle to look at the registration date on the license plate, Lawrence made a statement to the effect of "usually I just renew the registration at the end of the month, and then it's good to go." Id. at 118. Lawrence later told Officer Novacek his cousin owned the red Kia, but when Officer Novacek said the name of the person he found listed as the registered owner, Lawrence said his cousin had recently purchased the vehicle. (Video 2, 02:30-03:35; Video 3, 02:33-03:32).

Three screenshots from Officer Novacek's body camera are in evidence. Those exhibits show the documents Lawrence provided as proof of insurance, and they appear to identify Saibu as a "new owner" of the red Kia. (Doc. 362-1, Doc. 362-2, Doc. 362-3); (see also Tr. 91-96). Officer Novacek testified he had paid attention to insurance information in the documents and not to information in the documents about ownership of the red Kia. (Tr. 117). Officer Novacek acknowledged there was no report suggesting the red Kia had been stolen. Id. at 109.

Lawrence presented testimony of his cousin, Saibu. Saibu testified she purchased the red Kia in California—"somewhere near Sacramento or something like that"—in 2021 or 2022, paid four to five thousand dollars for it, did not remember the name of the male from whom she purchased it and could not describe him, had insurance on the vehicle but did not remember

[3] The interior squad car video shows Lawrence using a cellphone while he was in the back seat of the squad car and Officer Novacek was not present, but it does not appear Lawrence verbally communicated with anyone else during that time. (See Video 3, 30:50-32:00).

the name of the insurance company, had no documentation showing ownership of the red Kia, and was unaware there was no record of her ever being the registered owner of the vehicle in either North Dakota or California. Id. at 153-57. Further, Saibu testified she gave Lawrence permission to use the vehicle on March 8. Id. at 137. She acknowledged she did not have a driver's license at the time of the traffic stop, though she owned a vehicle. Id. at 155.

On cross-examination, the United States questioned Saibu about her involvement in drug trafficking. She denied involvement in facilitating shipments of fentanyl to Fargo for Lawrence and his brother, Ennis, denied she lived with Ethmonia Barclay on 16th Avenue South, denied she accepted payment for drug transactions on her CashApp account, denied knowing Barclay told other people to send money to Saibu's CashApp account for drug transactions, and did not remember receiving text messages about drug transactions in February 2022. Saibu testified the package that was in the red Kia on March 8 had "nothing to do with [her]," denied knowing the package contained fentanyl pills, acknowledged she had been at Barclay's apartment on March 8 but denied knowing Lawrence had stopped at Barclay's address shortly before he was pulled over in the red Kia, denied knowing Lawrence had told police the package in the red Kia was for her, and denied the package was for her. Id. at 147-50.

Later on March 8, Saibu was with Ennis and Barclay in a vehicle that was stopped at a Fargo gas station. Saibu denied knowing there was a large sum of cash, a gun, and a quantity of fentanyl pills in the vehicle that was stopped. Barclay's apartment was also searched on March 8, and Saibu denied knowing there had been drugs and a handgun in Barclay's apartment. Id. at 152.

After a period of cross-examination, Saibu refused to answer additional questions, asserting the prosecutor was trying to confuse her. Id. at 157. The United States then moved to strike her testimony but withdrew that motion after calling a rebuttal witness—[Federal Bureau of Investigation] Special Agent [Caleb] Williamson.

Special Agent Williamson testified about the FBI's research into Saibu's driving history and research into registration records for the red Kia. He testified queries of California and North Dakota motor vehicle records showed Saibu was not the registered owner of a vehicle in either state. Id. at 160. During a search of Barclay's apartment, law enforcement found a Non-Driver Identification Card issued to Saibu on March 1, 2022. (See Doc. 362-6). Though Special Agent Williamson identified the document as a license issued to Saibu on March 22, 2023, the document received in evidence is actually a North Dakota Driver's License Division Record Status report showing her license was suspended as of that date. (See Doc. 362-4).

Though no report of ATF Special Agent Nicholas Bradt is in the record, testimony established Special Agent Bradt authored a report stating Saibu owned the red Kia. (Tr. 89, 162-63). Special Agent Williamson confirmed a report by Special Agent Bradt identified Saibu as the owner of the red Kia but testified that appeared to be a "typographical error." Id. at 163-64. Further, he testified an earlier report by Special Agent Bradt identified Michell Robles-Gutierrez as owner of the red Kia and Saibu as owner of a different vehicle. Id. at 164. Special Agent Williamson recognized Robles-Gutierrez's Sacramento address on a California motor vehicle record as an address associated with a codefendant charged in a case joined with this case. Id. at 165.

Additionally, Special Agent Williamson authenticated a California vehicle registration card, issued March 28, 2022, but valid from March 2, 2022, to March 2, 2023, showing Jessicah Regina Ann Eckley, of Elk Grove, California, as the registered owner of the red Kia. (Doc. 362-5). Special Agent Williamson testified Eckley was "known to be associated" with Ennis. (Tr. 166). Special Agent Williamson testified he obtained that registration card from a cooperating witness who had purchased the red Kia and also testified the cooperating witness had trafficked drugs for the codefendant charged in a case joined with this case. Id. at 168.

**4. Ownership of the Package**

While Lawrence was in the back seat of the squad car for the second time, Officer Novacek asked if he knew anything about the package on the red Kia's front seat, and Lawrence told him the package was a gift for his cousin, Saibu, though the name on the package was that of Korlu Barclay, and denied the package was for him. (Video 3, 22:17-22:32). After Officer Novacek opened the package and saw something in the DVD port, he asked Lawrence if he knew anything about the package, and Lawrence did not respond. (Tr. 83; Video 2, 29:08-30:00; Video 3, 29:08-30:00).

During a brief period in January 2024, after the court allowed appointed counsel to withdraw and before the court appointed substitute counsel, Lawrence filed a pro se motion to suppress, which included several references to the searched package as "my mail." (Doc. 264, p. 3). The motion was denied a few days after it was filed, since substitute counsel had then been appointed. (Doc. 266). In a footnote, the United States argues the pro se filing does not change the analysis of Lawrence's expectation of privacy but that the United States will offer the filing as evidence Lawrence knowingly possessed the fentanyl pills found in the package. (Doc. 333, p. 13 n.6).

(Doc. 375, pp. 2-15).

## Evidence Presented at Second Hearing

During the December 11 hearing, Detective Heller testified that in 2022—the time relevant to this case—every FPD patrol vehicle, with the exception of those assigned to school resource officers, had a camera pointing toward the hood of the patrol vehicle and the camera system had a feature that captured license plate information—an ALPR system.[4] The ALPR data is collected through FPD's Axon system and is routinely retained in the system for ninety days. Tr. 2 at 13, 22.[5] He described the system as capturing photographs of license plates of vehicles the patrol vehicles meet in public areas. Those photographs depict the vehicle, a time stamp, and the location at which the photograph was taken. Further, he testified ALPRs do not capture data that is not accessible to the public. He gave examples of data the system could access—a license plate on a vehicle at the end of a private driveway or a vehicle in a parking lot near a street. The ALPR data is collected without consent from drivers. Id. at 9-11, 23-25, 38.

Generally, FPD uses ALPR data as an "investigative technique to create leads" in various types of investigations. Id. at 11. Detective Heller described the ALPR data collected from patrol vehicles as dependent on "a lot of variables . . . based on where that officer drives throughout their shift." Id. at 13. As Detective Heller described, any FPD sworn officer can search the ALPR data, without a warrant, if there is a criminal nexus giving reason to do so. Id. at 31-32.

Detective Heller testified that, sometime between March 1 and March 8, 2022, ATF Special Agent Bradt contacted him and asked him to search the red Kia's license

---

[4] FPD has since installed twenty-one cameras at fixed locations—intersection light posts or traffic lights; those cameras also link to the ALPR system.

[5] Tr. 2 refers to the hearing transcript filed at Docket 399.

plate number in the FPD's ALPR system. Detective Heller testified his search showed the red Kia had been parked "in the 3100 block of Third Street North on the roadway on the west side of the road" no less than ten times during February 2022. Id. at 14. He testified none of the ALPR photographs showed the vehicle in the parking lot of the apartment complex, none showed anyone inside or near the vehicle, and none showed people visible around the vehicle. ALPR photographs of the red Kia were not maintained in the Axon system. Detective Heller testified he likely relayed the search results to Agent Bradt verbally. Detective Heller also searched vehicle registration information and learned the red Kia was registered to a female from Sacramento, though there is no evidence of when he searched the registration information. Id. at 13-15, 26-27, 32.

On March 8, the day of the traffic stop, Detective Heller conducted surveillance at the Third Street North address in an attempt to arrest Ennis on a warrant for a parole violation. He testified neither he, nor anyone else on the investigative team, looked at ALPR data to determine whether the red Kia was at the address that day because having followed the vehicle from Scheels to the address on March 1, "we had a pretty good idea that's where we could locate the vehicle." Id. at 16. Further, he testified there were no other Fargo locations known to be associated with the red Kia and the only other Fargo location known to be associated with Ennis was the 16th Avenue South address. Detective Heller testified that if ALPR data had not existed, he would still have gone to the Third Street North address to conduct surveillance that day. Detective Heller testified that because the vehicle had been in the parking lot at the Third Street North address, the ALPR system captured no photographs that would have shown the red Kia at the Third Street North address on March 8. Id. at 16-18.

When he surveilled the Third Street North address on March 8, Detective Heller saw Lawrence exit the apartment complex, walk to the parking lot where the red Kia was parked, drive the red Kia to the 16th Avenue South address, go into the apartment building, "quickly come out[,] and then leave again." Id. at 18. Because of the route Lawrence drove, Detective Heller believed Lawrence was returning to his apartment and believed the red Kia and "whoever was occupying it at that time" was involved in drug trafficking. Id. at 18.

After he saw the red Kia heading back to the Third Street North address, Detective Heller radioed for any officers available to make a traffic stop, and Officer Novacek responded to that request. Detective Heller testified none of his conversations with Officer Novacek during the traffic stop involved any mention of the ALPR search or the results of that search. He testified the ALPR data was not important to the investigation and he could have done "the exact same thing that [he] did without ALPR." Id. at 19.

## Law and Discussion

The only question raised in the current motion that was not addressed in the first motion to suppress is whether law enforcement's use of ALPR data violated Lawrence's Fourth Amendment rights. If using ALPR data is not a search under the Fourth Amendment, there could be no Fourth Amendment violation.

### 1. Collecting ALPR Data as a Fourth Amendment Search

Lawrence argues law enforcement's warrantless collection and use of ALPR data violated his Fourth Amendment rights, asserting he maintains a "reasonable expectation of privacy in his physical movements even when those movements occur in public spaces." (Doc. 382, p. 3). He asserts ALPR technology enables government surveillance

that was not yet possible when cases like United States v. Jones, 565 U.S. 400 (2012), and Carpenter v. United States, 585 U.S. 296 (2018), were decided and Fourth Amendment protections should evolve along with technology, as the Supreme Court noted in Kyllo v. United States, 533 U.S. 27, 28 (2001). Id. at 4, 14-15.

In Jones, the Supreme Court held the government's warrantless installation of a GPS tracking device on a vehicle constitutes a search under the Fourth Amendment. While the majority relied on a trespass theory, Lawrence argues Justice Sotomayor's concurrence outlines the privacy implications of GPS location tracking, where she noted such warrantless tracking creates a "precise, comprehensive record of a person's public movements." 565 U.S. at 415 (Sotomayor, J., concurring). Lawrence also quotes Justice Alito's concurrence, arguing it demonstrates that under the Fourth Amendment, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." Id. at 430 (Alito, J., concurring).

The Supreme Court expanded the Fourth Amendment protections of Jones in Carpenter, holding the government's warrantless acquisition of historical cell-site records from the defendant's wireless carrier violated the Fourth Amendment. The court noted an individual's cell phone, as compared to a vehicle as in Jones, is almost a "feature of human anatomy" allowing the government to track nearly exact movements of its owner. Id. at 311 (quoting Riley v. California, 573 U.S. 373, 385 (2014)). Lawrence argues that, like GPS tracking in Jones and historical cell-site records in Carpenter, ALPR systems provide law enforcement with warrantless access to an individual's

historical location information that reveals private patterns and associations in violation of the Fourth Amendment. (Doc. 382 p. 4).

The United States urges the court to

> rebuff Lawrence's invitation to issue a sweeping ruling on the general constitutionality of ALPR and instead confine its analysis to what happened here. ALPR did not follow Lawrence everywhere he went. It did not follow him into a family home, a political meeting, a business, a house of worship, or someone's bedroom. It captured a handful of pictures over a month of a red car not even registered to him sitting empty on a single public street in front of an apartment complex. That is not a precise, comprehensive record of a person's public movements. That is not a wealth of detail about [Lawrence's] familial, political, professional, religious, and sexual associations. That is not secretly monitor[ing] and catalog[ing] every single movement of an individual's car for a very long period. That is not almost a feature of human anatomy that achieves near perfect surveillance, as if [the government] had attached an ankle monitor.

(Doc. 390, p. 10) (internal quotation marks and citations omitted).

The government asserts "every federal court to consider the question has soundly rejected the same arguments Lawrence makes now" and Lawrence "fails to cite even one case finding that collection and use of ALPR data constitutes a Fourth Amendment search mandating a warrant." Id. The government then goes on to cite to eleven cases supporting its position. Id. at 11.

The cases the government cites rely on United States v. Knotts, where the Supreme Court held "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." 460 U.S. 276, 281-82 (1983). The Court reasoned a person traveling on public roads voluntarily conveys to anyone who wants to see "the fact that he was traveling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." Id. The Eighth Circuit has concluded that "no person possesses a privacy interest in their

license plates." United States v. Sparks, 37 F. App'x 826, 829 (8th Cir. 2002) (citing United States v. Walraven, 892 F.2d 972, 974 (10th Cir. 1989)). Other district courts have reached the same conclusion. See, e.g., United States v. Cooper, No. 23-131, 2025 WL 35035, at *5 (E.D. La. Jan. 6, 2025); United States v. Bowers, No. 2:18-CR-00292-DWA, 2021 WL 4775977, at *3 (W.D. Pa. Oct. 11, 2021).

Although neither the Supreme Court nor the Eighth Circuit has directly ruled on the question, other courts have held that law enforcement's use of ALPR data is not a search under the Fourth Amendment because ALPR data is distinguishable from other types of surveillance in that it is significantly less comprehensive. For example, in United States v. Jiles, the court found accessing an ALPR database is not a search within the meaning of the Fourth Amendment because although "law enforcement can utilize the ALPR database to receive location information on individual cars over lengthy periods, the ALPR database is substantially limited relative to a GPS monitor, as in Jones, or cell-site location information, as in Carpenter." 2024 WL 891956, at *19 (D. Neb. Feb. 29, 2024). A GPS tracking device, such as was at issue in Jones, tracks a vehicle's movement to every location to which it travels. See Jones, 565 U.S. 400 (2012). "By contrast, the ALPR system records a vehicle's location only when it passes one of the limited (though expanding) number of ALPRs," Scholl v. Illinois State Police, 776 F. Supp. 3d 701, 720-21 (N.D. Ill. 2025), but does not involve a "physical intrusion by the [g]overnment to any private property." Jiles, 2024 WL 891956, at *15-19. Unlike historical cell-site location data, such as that involved in Carpenter, ALPR data does not create an all-encompassing record of an individual's whereabouts or create a detailed log of their precise movements. See United States v. Sturdivant, 786 F. Supp. 3d 1098, 1111-12 (N.D. Ohio 2025); see also Carpenter, 585 U.S. at 311. Some of the cases the

government cited involved ALPRs mounted on utility poles, which gather significantly more information than the method of collection employed here, and could thereby invite further issues under the Fourth Amendment. See United States v. Jackson, No. 24-cr-10010, 2025 WL 1530574 (D. Kan. May 29, 2025); United States v. Martin, 753 F. Supp. 3d 454 (E.D. Va. 2024).

Courts have declined to categorize use of ALPR data collections as impermissible dragnet searches. See, e.g., Sturdivant, 786 F. Supp. at 1113; United States v. Martin, 753 F. Supp. 3d 454, 472 (E.D. Va. 2024) (noting ALPR systems are not designed to "track or monitor the entirety of an individual's movements during a particular car trip, much less through the activities of their daily life") (internal quotations omitted); United States v. Yang, 958 F.3d 851, 864 (9th Cir. 2020) (Bea, J., concurring in the judgment) (noting that only if ALPR technology evolves to provide more pervasive and precise location information akin to that in Carpenter, "then perhaps in the future a warrant may be required for the government to access the [ALPR] database"); United States v. Rubin, 556 F. Supp. 3d 1123, 1127-29 (N.D. Cal. 2021) (same). Lawrence cites to Commonwealth v. McCarthy, where the Massachusetts Supreme Judicial Court noted that "with enough cameras in enough locations, the historic location data from an ALPR system . . . would invade a reasonable expectation of privacy and would constitute a search for constitutional purposes." (Doc. 382, p. 7) (quoting 142 N.E. 3d 1090, 1104 (Mass. 2020)). While that may prove true in the future, at this time, the method of ALPR technology FPD employed does not rise to a level invading a reasonable expectation of privacy constituting a Fourth Amendment search.

Lawrence cites no case law adopting the position he posits. Nor has this court's research identified cases doing so. Lawrence has not advanced arguments sufficient to

lead the court to conclude use of ALPR data should be considered a Fourth Amendment search. Even if the conclusion were theoretically viable, the evidence shows ALPR data was not a factor contributing to the traffic stop and the package search that followed. This court recommends the district judge conclude the use of ALPR data was not a search under the Fourth Amendment and did not violate Lawrence's constitutional rights.

**2. Independent Source Doctrine**

If, however, the district judge concludes use of the ALPR data violated Lawrence's Fourth Amendment rights, the government asserts application of the independent source doctrine. The government argues, even without the ALPR data, reasonable suspicion supported investigating the red Kia for drug trafficking on March 8. Supporting that position, the government cites evidence that law enforcement observed the red Kia in the Scheels parking lot and followed it from there to Third Street North. In the government's view, detective Heller would have "gone to the same place, at the same time, seen Lawrence make the same short-term trip to Ethmonia Barclay's apartment, and made the same radio call resulting in the vehicle being stopped for expired registration even if he had never looked at the ALPR database." In the view of the government, ALPR data "provided an insignificant corroborative detail about the red Kia that played no role whatsoever in establishing reasonable suspicion to investigate the vehicle for drug trafficking." (Doc. 390, p. 12). This court agrees.

The independence source doctrine permits an unlawful search to thwart suppression "if the evidence both would have been acquired by lawful means had the unlawful search not occurred and in fact was acquired (or reacquired) by these lawful means." United States v. Baez, 983 F.3d 1029, 1037 (8th Cir. 2020). But, if the district

judge concludes collection and use of ALPR data is not a search that violated Lawrence's Fourth Amendment rights, application of the independent source doctrine need be considered.

### 3. Issues Previously Decided

Lawrence's second motion to suppress, (Doc. 381), and the government's opposition, (Doc. 390), raise arguments regarding Lawrence's standing to challenge the search of the package and about whether the collective knowledge doctrine and the automobile exception may be applied to cure any constitutional deficiencies in the acquisition and use of the ALPR data. But, in this court's opinion, neither party has shown reason for the court to reconsider any of those issues.

#### A. Collective Knowledge Doctrine

Lawrence argues the collective knowledge doctrine cannot cure law enforcement's underlying Fourth Amendment violation—the warrantless ALPR data collection. (Doc. 382, pp. 5-6). The collective knowledge doctrine imputes the knowledge of one law enforcement officer to another so the combined knowledge of multiple officers can justify the actions taken. United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001). The United States asserts the court should reject Lawrence's arguments regarding collective knowledge as it did in denying the first motion to suppress. (Doc. 390, p. 9). This court agrees. The district judge adopted this court's recommendation rejecting Lawrence's arguments regarding the collective knowledge doctrine, (Doc. 386, pp. 3-4), and Lawrence has not shown reason to conclude otherwise.

### B. Application of Automobile Exception to Package Search

The district judge adopted this court's recommendation and concluded the probable cause that existed to search the red Kia extended to containers in the vehicle that could have contained contraband. (Doc. 386, pp. 5-6). Specifically, this court recommended the district judge conclude "Officer Novacek's detection of the odor of marijuana provided probable cause to search the vehicle and any containers within the vehicle that could have contained marijuana. Because a package the size of a DVD player could have contained marijuana, Officer Novacek had probable cause to search the package." (Doc. 375, p. 29). The district judge adopted this court's recommendation and Lawrence has not shown reason to conclude otherwise.

### C. Standing to Challenge the Package Search

The United States argues Lawrence lacks standing to challenge the package search. In its prior report and recommendation, this court analyzed the question of Lawrence's standing to challenge the search of the package and recommended "the district judge assume, without deciding, that Lawrence has standing to assert his Fourth Amendment claims concerning the package." (Doc. 375, pp. 20-22). The district judge adopted that recommendation. (Doc. 386, p. 2). The United States argues the court "should now definitively conclude standing for the package is absent." (Doc. 390, p. 5). But, given this court's recommendation regarding use of ALPR, and the minimal use of ALPR in this case, the United States has not shown reason to again address the question of standing.

## Recommendation

Under current case law, law enforcement's use of ALPR data is not a search under the Fourth Amendment. Therefore, Lawrence's arguments that his Fourth Amendment rights and reasonable expectation of privacy were violated and that ALPR data collection amounted to an impermissible dragnet surveillance are unsupported. Moreover, evidence shows ALPR data was not a factor contributing to the traffic stop or to the package search that followed.

This court, for the reasons stated herein, **RECOMMENDS** the district judge **DENY** Lawrence's second motion to suppress evidence.

Dated this 15th day of January, 2026.

*/s/ Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

## NOTICE OF RIGHT TO OBJECT[6]

Either party may object to this Report and Recommendation by filing with the Clerk of Court no later than **January 29, 2026**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

[6] See Fed. R. Crim. P. 59; D.N.D. L. Crim. R. 59.1(D)(3).